

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-345-CV

IN THE INTEREST OF H.H., AND
AND H.H., CHILDREN

-----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

### I. INTRODUCTION

In three issues, Appellant Hollie H. argues that the evidence is legally and factually insufficient to support the termination of her parental rights to H.H. (Jane) and H.H. (Mary).[2]  We will affirm.

---

[1] *See* TEX. R. APP. P. 47.4.

[2] We use fictitious names in accordance with section 109.002(d) of the family code.  TEX. FAM. CODE ANN. § 109.002(d) (Vernon 2002).

## II. BACKGROUND FACTS

In September 2006, Child Protective Services (CPS) began working with Hollie to reunify her with Jane, the older child, who was living with Hollie's cousin. A CPS safety plan was in place that required Hollie to leave Jane in the care of her cousin until she engaged in recommended services. The CPS caseworker, Tonyette Stafford, testified that Hollie told her that the safety plan was put into effect because at that time, there was no running water in her home on South Perkins and she had admitted to the previous CPS worker that she was using cocaine. Hollie was about eight months pregnant with Mary, the younger child, at the time, and admitted to Stafford that she was using cocaine. Stafford asked Hollie take a drug test in September, but Hollie failed to take the test.

Stafford developed a service plan for Hollie that required her to go to parenting classes and drug treatment, to attend a psychological evaluation, and to improve the condition of her home. Stafford testified that Hollie admitted to using drugs throughout the pregnancy. Stafford also testified that, although she encouraged Hollie to enter drug treatment and discussed the dangers of drug use during pregnancy with her, Hollie never entered treatment. Mary was born in October 2006 and tested positive for cocaine at the time of birth.

2

Stafford testified that when Mary was born, Hollie's home was not safe for small children.

Shortly after Mary was born, CPS removed Jane, who had been in voluntary placement with another family member, and took her into CPS care along with Mary. Prior to removal, CPS checked with the family member who was caring for Jane to see if placing Mary with her was an option; the family member stated that she was unable to care for a second child. Stafford testified that, after the removal, she informed Hollie that she could still get her children back by completing the service plan and showing that she could be a good mother, which Hollie stated she wanted to do. However, Hollie did not complete any of the services on her service plan.

By the time of trial, in August and September 2007, Hollie was pregnant again. She testified that she had begun using marijuana at age thirteen and that she was kicked out of school in the ninth grade. She stated that her plan if she got her children back was to move in with the father of her third child, who had a history of assault.[3] Hollie testified that she gave birth to Jane when she was

---

[3] Earlieve Hampton, the alleged father of Hollie's third child, was in jail during Hollie's trial, awaiting his own trial on an indictment for assault. His charge was enhanced as a habitual offender due to seven previous assault convictions and a burglary of a habitation conviction. Hollie testified that he would not hurt her children because he loves them, that she had known Hampton for less than two years at the time of trial, and that she had been

3

sixteen and that all she knew about Jane's father was that he was a twenty-seven-year-old illegal alien who went by the nickname "Taco." She had known him for only a week before moving in with him.

On the last day of trial, the children's attorney ad litem asked Hollie if it was in the best interest of her children for them to be placed back with her. Hollie replied, "Not at the moment, but I want them back." Hollie testified that she had a cousin who wanted to adopt her kids, but that she would not be willing to voluntarily terminate her rights so that her children could be adopted.

The State sought termination of Hollie's parental rights on endangerment grounds. *See* TEX. FAM. CODE ANN. § 161.001(1) (D), (E) (Vernon Supp. 2007). After a bench trial, the trial court found that Hollie (1) knowingly placed or knowingly allowed Jane and Mary to remain in conditions or surroundings which endangered their physical and emotional well-being and (2) engaged in conduct or knowingly placed them with persons who engaged in conduct which endangered their physical or emotional well-being. It additionally found that it was in the best interest of Jane and Mary that Hollie's parental rights be terminated and that the State should receive custody and managing conservatorship of the children. This appeal followed.

---

living with him on and off since the day they met.

4

Hollie contends that the evidence is legally and factually insufficient to support the trial court's best interest and family code section 161.001(1)(D) and (E) findings.[4]

## A. Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just

---

[4] The State argues that Hollie's legal and factual sufficiency challenges are not properly before this court because her combined motion for new trial and statement of points did not comply with the requirements of section 263.405(i) of the family code. *See* TEX. FAM. CODE ANN. § 263.405(i) (Vernon Supp. 2007). Having previously held that section 263.405(i) violates the Texas constitution, we will review Hollie's issues. *See In re D.W.*, 249 S.W.3d 625, 629 (Tex. App.—Fort Worth, 2008, pet. filed) (holding that section 263.405(i) is void as a violation of the separation of powers provision of the Texas constitution).

to limit parental rights but to end them permanently–to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish at least one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. § § 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the

reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id*. But we cannot weigh witness credibility issues that depend on

7

the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id*. at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id*. at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67.

**B. Analysis**

**1. Endangerment**

The term "endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533. Although both subsections (D) and (E) involve endangerment, under subsection (D), the environment of a child must be examined to determine if that is a source of endangerment to the child. TEX. FAM. CODE ANN. § 161.001(1)(D); *In re D.T.*, 34 S.W.3d 625, 632 (Tex App.—Fort Worth 2000, pet. denied). When analyzing the trial court's findings under subsection (E), we must determine whether sufficient evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re D.M.*, 58 S.W.3d 801, 811–12 (Tex. App.—Fort Worth 2001, no pet.). Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *D.T.*, 34 S.W.3d at 634; *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). However, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id*.

To determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *D.M.*, 58 S.W.3d at 812. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

A pattern of continued drug use, including drug use during the pregnancy of another child and a parent's failure to remain drug-free while under the State's supervision, will support a finding of endangering conduct under section 161.001(1)(D) even if there is no direct evidence that the parent's drug use actually injured the child. *Vasquez v. Tex. Dep't of Prot. & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (holding evidence legally and factually sufficient to support endangering-conduct finding when older sibling of subject child tested positive for drugs at birth and parent continued to use drugs after subject child's birth and during pendency of Department's involvement). A fact-finder may reasonably infer from a parent's failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.); *see also In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet)(reasoning that a parent's engaging in illegal drug activity after agreeing not to do so in a service

plan for reunification with her children is sufficient to establish clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children).

Here, the record shows that Hollie used illegal drugs throughout CPS's involvement in her life. Hollie continued to use illegal drugs even after CPS informed her of its concerns and that she could be harming her unborn baby. When Mary was born cocaine positive, CPS removed her and Jane from Hollie's care. CPS created a service plan for Hollie that included drug treatment, but Hollie failed to enter drug treatment or complete any of the other services that CPS recommended. Hollie has also found it difficult to remain employed.

The State presented substantial testimony during the trial to support its contention that the South Perkins home, where Hollie and Jane had been living, was not a safe environment for a young child. Hollie and Jane were living in the South Perkins home when CPS initiated the investigation. A CPS worker testified that there was old food and clothing strewn throughout the home, an open pornographic magazine lying in plain view on the kitchen floor, and minimal food in the home. He described the kitchen as being covered in a greasy residue and stated that the stove had accidently been left on over night. He also noted that the bathroom was very dirty and did not have a functioning toilet or sink and that there was no hot water in the residence.

11

Hollie testified at trial that her plan if the children were returned to her was to move back in with Earlieve Hampton, and she offered no alternative plan when confronted with the information that Hampton was in jail and might be a danger to her children. Hollie presented evidence that the South Perkins home had been cleaned up and that she had completed all but one day of a drug rehabilitation program. And she pointed out that Jane was not living with her in the South Perkins home at the time of the removal because she had already voluntarily placed Jane with a relative.

The State's evidence supporting termination of Hollie's parental rights includes Hollie's multiple admissions of drug use during the case; her failure to complete several requested drug tests; her multiple positive drug tests, which included marijuana, cocaine, and methamphetamine; her lack of stable, suitable housing for her children; her lack of effort in attending and completing CPS services; the CASA volunteer's recommendation that Hollie's parental rights be terminated; and Mary testing positive for cocaine at birth.

Hollie had many explanations for her inability to complete the CPS service plan. Hollie stated that she was delayed from entering drug treatment because initially she thought she had to pay for it and did not have the money. When she figured out that she did not have to pay, she discovered that her I.D. card had been stolen and she could not enter until she obtained a new one.

12

When a "bed" again became available, Hollie stated that the notice was too short and she did not have the proper clothing necessary to attend. Hollie did not engage in an aftercare program because it did not start until after her trial began and she felt the programs were either too early or too late in the day.

Viewing all the evidence in the light most favorable to the trial court's judgment, we conclude that the trial court could have reasonably found that Hollie endangered her children. The evidence established that Hollie allowed Jane to remain in conditions and surroundings that endangered her physical and emotional well-being and that her continuous drug use constituted conduct that endangered both Jane's and Mary's physical and emotional well-being. *See J.P.B.*, 180 S.W.3d at 573.

Giving due deference to the trial court as the fact-finder, we also conclude that the evidence was factually sufficient. Based on the entire record, the trial court could have reasonably concluded that Hollie's drug use and failure to provide a safe environment for her children endangered them. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E). We overrule Hollie's first two issues.

### 2. Best Interest

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *Id.* § 263.307(a). There is also a strong presumption that keeping a child with a parent is in the child's best

interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)     the desires of the child;

(2)     the emotional and physical needs of the child now and in the future;

(3)     the emotional and physical danger to the child now and in the future;

(4)     the parental abilities of the individuals seeking custody;

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that

14

termination is in the best interest of the child. *Id*. On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id*.

### a.     Desires of the Children

At the time of trial, Jane was three years old, and Mary was eleven months old. Hollie testified that Jane told her that she wanted to go home with her and did not want to go with CPS at the end of her visits. She stated that, during the visits, she held Mary and that Jane interacted with her and brought toys and puzzles over to her. A CPS worker who monitored the visits agreed that Jane was always happy to see Hollie at the visits, but she was concerned that Jane was not as bonded with Hollie as she should be. Hollie's counsel pointed out that Jane had spent a majority of her life in someone else's care and that Hollie never had custody of Mary. The children's court appointed advocate testified that the children were bonded with their foster family and called their foster parent "mom."

### b.     Emotional and Physical Needs and Danger

The State presented evidence that Hollie had a long history of illegal drug use, and despite multiple opportunities before and during trial, she did not complete a drug treatment program, engage in aftercare programs, or show a desire to maintain a drug-free lifestyle. Hollie's plan to meet the children's

15

needs in the future was to move in with Hampton, and she did not offer an alternative plan when questioned about Hampton's illegal drug use and history of crime and violence.

### c. Parental Abilities

Hollie was referred to parenting classes during the initial investigation and as part of her service plan. The State presented evidence that, during the course of CPS's involvement in Hollie's life, she had not shown the ability to find employment, maintain stable housing, complete parenting classes, or establish any pattern that would indicate that she was able to become or remain drug free.

### d. Plans for the Children

The State presented adoption as its plan for the children. A CPS representative testified that there was very little chance that the children would not be adopted. She stated that the current foster family was considering adoption and that there were three other families interested in adopting Jane and Mary if the current family did not adopt them. Hollie testified during the trial that she did not think it was in her children's best interest that they be returned to her at that time.

16

### e.    Stability of the Home

Prior to removal by CPS, Jane had lived at three different residences and with three different people since turning six months old. A CPS worker testified that, in her opinion, Hollie was not capable of living independently and that Hollie failed to participate in services that would have helped her gain those skills.

Another CPS worker testified that, during the year that the children were in CPS's care, the children were moved twice, to two different foster homes. However, CPS placed the children in a foster home that was approved for adoption, and its plan was to have both children adopted by the same family so that the children would not need to be moved again.

### f.    Acts or Omissions

Hollie regularly visited her children after their removal, but after the trial started, she missed a visit and did not call CPS. Her excuse was that she was too sick to call and slept through the visit. Additionally, a CPS worker testified that on one occasion, she believed that Hollie came to the visit with her children while she was under the influence of drugs and that Hollie refused to take a drug test when confronted.

Hollie testified that she did not complete various services because she did not have identification, she hated herself, she did not think she would get Jane

17

back, and she lacked transportation.  However, a CPS worker testified that she had arranged for transportation to all of the services that Hollie was asked to complete.

Viewing all the evidence in the light most favorable to the judgment, we hold that the evidence was legally sufficient to support the trial court's finding that termination of Hollie's parental rights was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(2).  Viewing the same evidence in a neutral light, we hold that it was also factually sufficient to support the trial court's findings that termination of Hollie's parental rights was in the children's best interest. *See id.*  We overrule Hollie's third issue.

## IV. CONCLUSION

Having overruled all of Hollie's issues, we affirm the trial court's judgment terminating Hollie's parental rights to Jane and Mary.

PER CURIAM

PANEL F:  HOLMAN, LIVINGSTON, and DAUPHINOT, JJ.

DELIVERED:  July 24, 2008

18